[No. D042813. Fourth Dist., Div. One. June 22, 2004.]

ALICIA PALACIN, Plaintiff and Appellant, v.
ALLSTATE INSURANCE COMPANY, Defendant and Respondent.

**COUNSEL**

Dunk & Associates, Andrew P. P. Dunk III and Rebecca Lack Mowbray for Plaintiff and Appellant.

Luce, Forward Hamilton & Scripps, Peter K. Klee, John T. Brooks and Jeffrey V. Commisso for Defendant and Respondent.

**OPINION**

**HALLER, J.**—Alicia Palacin purchased a condominium owner's insurance policy from Allstate Insurance Company (Allstate) covering real property items "which are your insurance responsibility as expressed or implied under the governing rules of the condominium." When Palacin tendered a claim to Allstate for water damage to her walls and floors, Allstate denied the claim, stating that the damaged items were not Palacin's "insurance responsibility" under the homeowners association rules.

Palacin brought a breach of contract, fraud, and bad faith action against Allstate. Allstate successfully demurred to the complaint on the basis that there was no coverage as a matter of law. Palacin appeals. We conclude the

court properly sustained the demurrer, but erred in failing to grant Palacin leave to amend to allege: (1) the claim is not covered by the homeowners association's insurance policy and therefore the property damage was her implied insurance responsibility triggering policy coverage; and/or (2) Palacin's real property that was damaged constituted covered "improvements" within the meaning of the insurance policy.

## FACTUAL AND PROCEDURAL BACKGROUND

Palacin owns a condominium unit in a condominium development known as Casablanca, which is governed by a declaration of covenants, conditions and restrictions (Casablanca CC&R's) and managed by a homeowners association (Homeowners Association). The Casablanca CC&R's places responsibility on each condominium unit owner to maintain and repair the interior structures and surfaces of the condominium, and the Homeowners Association is responsible for maintaining the common areas and common structural components (roofs, exterior walls, exterior plumbing) of the buildings. The Casablanca CC&R's imposes primary responsibility on the Homeowners Association to obtain liability and property insurance for the entire development, and permits a condominium unit owner to separately insure his or her unit only under certain limited circumstances, which will be discussed in more detail below.

In 2001, Palacin purchased from Allstate a first party "Condominium Owners" insurance policy that provided coverage for damage to real and personal property (the Allstate policy). With respect to the real property protection, the Allstate policy states in relevant part:

"Coverage A

Building Property Protection

Property We Cover Under Coverage A: We will cover items of real property pertaining directly to your resident premises *which are your insurance responsibility as expressed or implied under the governing rules of the condominium.* This includes fixtures, construction materials and supplies, installations or additions comprising a part of the residence premises, only when situated within that portion of the premises used exclusively by you and made or acquired at your expense." (Boldface omitted, italics added.)

The policy covers "sudden and accidental direct physical loss to the property described in Coverage A—Building Property Protection, except as limited or excluded in th[e] policy." (Underscoring omitted.)

In approximately March 2002, Palacin made a claim to Allstate under the policy's "Building Property Protection" provision, seeking insurance coverage for water damage to the interior of her condominium unit that resulted from a water leak from a neighboring unit. Allstate denied the claim on the basis that the Homeowners Association was responsible for obtaining insurance for the claimed loss and therefore the Allstate policy did not cover the loss under the policy terms.

Palacin filed a complaint against Allstate, alleging three causes of action: breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud. Palacin's complaint alleges that on two different days in February and March 2002, she sustained a "physical loss to the interior surfaces" of her condominium unit resulting from a "sudden and accidental discharge of water" on "that portion of the premises used exclusively by [Palacin] (the inner surfaces of the walls, ceilings, and floors) and which was expressly or impliedly [Palacin's] maintenance and/or insuring responsibility under the governing rules of [Palacin's] Condominium Association." Palacin alleged that the loss "was precisely the type of loss" that the Allstate policy "is designed to and expressly covers."

Allstate demurred to the complaint, arguing that Palacin's insurance policy did not provide coverage for real property damage inside Palacin's condominium because: (1) the policy covered only those real property items "which are your insurance responsibility as expressed or implied under the governing rules of the condominium"; and (2) the governing rules of the condominium (the CC&R's) do not place the responsibility on Palacin to insure the interior structure of her condominium. In support of this argument, Allstate requested the court to take judicial notice of the Casablanca CC&R's. Allstate additionally argued that its policy was an excess policy to the Homeowners Association's insurance policy, and Palacin did not allege that these insurance limits had been exhausted.

In response, Palacin did not object to the request for judicial notice of the Casablanca CC&R's, but argued that under the CC&R's she was responsible for obtaining insurance for the interior structure of her condominium unit and therefore her damages were covered by the Allstate policy. At the hearing, Palacin's counsel clarified that Palacin had initially made a claim for the water damage to the Homeowners Association's insurer, but the insurer had denied the claim based on its assertion that the Association's policy "doesn't cover floods." Counsel stated that Palacin could amend the complaint to reflect these facts.

The court ultimately concluded that even assuming Palacin could amend the complaint to allege that the loss was not covered by the Homeowners

Association's insurance policy, the complaint would not state a basis for recovery because the Casablanca CC&R's unambiguously place sole responsibility on the Homeowners Association to obtain insurance coverage for the interior structure of the Casablanca condominium units. Accordingly, the court sustained the demurrer, and entered judgment in Allstate's favor.

## DISCUSSION

### I. *Review Principles*

■ On appeal from a judgment after a demurrer is sustained without leave to amend, we review the trial court's ruling de novo, exercising our independent judgment on whether the complaint states a cause of action. (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501 [82 Cal.Rptr.2d 368].) The issue is whether the complaint states facts sufficient to constitute a cause of action on any available legal theory. (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43 [96 Cal.Rptr.2d 354].) We assume the truth of all properly pleaded facts, as well as facts inferred from the pleadings, and give the complaint a reasonable interpretation by reading it as a whole and all its parts in their context. (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 579 [94 Cal.Rptr.2d 3, 995 P.2d 139].) We must also consider matters properly judicially noticed. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) We give no credit to pleaded contentions or legal conclusions. (*Financial Corp. of America v. Wilburn* (1987) 189 Cal.App.3d 764, 768–769 [234 Cal.Rptr. 653].)

■ Further, in determining whether the court properly refused to permit an amendment, we must reverse if there is a reasonable possibility the defect can be cured by amendment. (*Schifando v. City of Los Angeles, supra,* 31 Cal.4th at p. 1081.) The plaintiff has the burden of proving a reasonable possibility of curing a defect by amendment. (*Ibid.*)

### II. *Insurance Policy Construction Rules*

■ The interpretation of an insurance policy is governed by well-settled contract interpretation principles. (*E.M.M.I., Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 [9 Cal.Rptr.3d 701, 84 P.3d 385] (*E.M.M.I.*).) The fundamental rule is that a court must give effect to the mutual intention of the parties when they formed the contract. (*Ibid.*) This intent is to be inferred, if possible, solely from the written provisions of the contract. (*Ibid.*) "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' . . . , controls judicial interpretation." (*Ibid.*)

■ "A policy provision is ambiguous when it is susceptible of two or more reasonable constructions. . . . Language in an insurance policy is 'interpreted as a whole and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.' " (*E.M.M.I., supra*, 32 Cal.4th at p. 470.) When the relevant provisions of an insurance policy are ambiguous, extrinsic evidence may be admitted to determine the proper interpretation. (*Kavruck v. Blue Cross of California* (2003) 108 Cal.App.4th 773, 782 [134 Cal.Rptr.2d 152]; *Glenfed Development Corp. v. Superior Court* (1997) 53 Cal.App.4th 1113, 1118–1119 [62 Cal.Rptr.2d 195].) If there is no relevant extrinsic evidence or the extrinsic evidence does not resolve the ambiguity, the court must interpret " ' " 'the ambiguous provisions in the sense the [insurer] believed the [insured] understood them at the time of formation. [Citation.] If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. [Citation.]' 'This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, "the objectively reasonable expectations of the insured." ' " ' " (*E.M.M.I., supra*, 32 Cal.4th at p. 470, brackets in original.)

■ Applying these rules at the pleading stage, an insurer moving for a demurrer based on insurance policy language must establish conclusively that this language unambiguously negates beyond reasonable controversy the construction alleged in the body of the complaint. (*Columbia Casualty Co. v. Northwestern Nat. Ins. Co.* (1991) 231 Cal.App.3d 457, 468–473 [282 Cal.Rptr. 389].) To meet this burden, an insurer is required to demonstrate that the policy language supporting its position is so clear that parol evidence would be inadmissible to refute it. (*Id.* at p. 469.) Absent this showing, the court must overrule the demurrer and permit the parties to litigate the issue in a context that permits the development and presentation of a factual record, e.g., summary judgment or trial.

## III. *Governing Insurance Policy Provisions*

The Allstate policy states the policy covers "items of real property pertaining directly to your residence premises which are your insurance responsibility *as expressed or implied under the governing rules of the condominium.*" (Boldface omitted, italics added.) The parties agree that the "governing rules of the condominium" are contained in the Casablanca CC&R's and that the trial court properly took judicial notice of this document. Two sections of the Casablanca CC&R's—sections 8.2 and 8.3—set forth rules regarding real property insurance.[1]

---

[1] All further section references are to the Casablanca CC&R's, unless otherwise specified.

Section 8.2 states that "The Association . . . shall obtain and maintain a master or blanket policy of fire insurance for the full insurable value of all of the improvements within the Development. . . ." This section additionally states that the policy shall name as an insured the Homeowners Association and each condominium owner and identifies the amount and type of coverages that this insurance must include. With respect to the type of coverages, section 8.2 states the policy shall contain "an extended coverage endorsement, vandalism, malicious mischief coverage, [and] a special form endorsement . . . ."[2]

Section 8.3 limits the type of property insurance that each individual condominium owner is entitled to purchase. The section begins: "Except as provided in this Section, *no Owner can separately insure his Unit or any part of it* against loss by fire or other casualty *covered by any insurance carrier* under Section 8.2." (Italics added.) This paragraph then sets forth two exceptions to this rule. First, "[a]n Owner can . . . insure his personal property against loss." Second, "any improvements made by an Owner within his Unit may be separately insured by the Owner, but the insurance is to be limited to the type and nature of coverage commonly known as tenant's improvements."[3]

---

[2] Section 8.2 states in full: "Fire and Extended Coverage Insurance. The Association also shall obtain and maintain a master or blanket policy of fire insurance for the full insurable value of all of the improvements within the Development. The form, content, and term of the policy and its endorsements and the issuing company must be satisfactory to all institutional first Mortgagees. If more than one institutional first Mortgagee has a loan of record against the Development, or any part of it, the policy and endorsements shall meet the maximum standards of the various institutional Mortgagees represented in the Development. The policy shall contain an agreed amount endorsement or its equivalent, an increased cost of construction endorsement or a contingent liability from operation of building laws endorsement or their equivalent, an extended coverage endorsement, vandalism, malicious mischief coverage, a special form endorsement and a determinable cash adjustment clause or a similar clause to permit cash settlement covering full value of the improvements in case of partial destruction and a decision not to rebuild. The policy shall be in the amounts as shall be determined by the Board. The policy shall name as insured the Association, the Owners and Declarant, as long as Declarant is the Owner of any Condominiums and all institutional first Mortgagees as their respective interests may appear, and may contain a loss payable endorsement in favor of the trustee described in this Declaration."

[3] Paragraph 8.3 states in full: "Individual Fire Insurance Limited. Except as provided in this Section, no Owner can separately insure his Unit or any part of it against loss by fire or other casualty covered by any insurance carrier under Section 8.2. If any Owner violates this provision, such Owner will be liable for any diminution in insurance proceeds otherwise payable pursuant to the provisions of Section 8.4 that result from the existence of such other insurance to the Association to the extent of any such diminution. Any Owner can, however, insure his personal property against loss. In addition, any improvements made by an Owner within his Unit may be separately insured by the Owner, but the insurance is to be limited to the type and nature of coverage commonly known as tenant's improvements. All such insurance that is individually carried must contain a waiver of subrogation rights by the carrier as to other Owners, the Association and Declarant."

As both parties recognize, the primary purpose of these provisions is to avoid double coverage by allocating insurance responsibility between the Homeowners Association and an owner of a condominium unit. If both the master and individual policy cover the same loss, the unit owner may be compelled to pay twice for the same insurance—once through homeowners association dues and then again through individual policy premiums. Additionally, double coverage can lead to disputes over control of proceeds, where the "association could be faced with the obligation to repair where a portion of the insurance proceeds is controlled by a member." (Scull & Wagner, *Insurance and Damage and Destruction Provisions for Condominiums and Planned Developments* (Spring 1993) 11 Cal. Real Prop. J. 18, 21.) Double coverage can also increase the risk of subrogation disputes. (See *Schiller v. Community Technology, Inc.* (1980) 78 A.D.2d 762 [433 N.Y.S.2d 640, 642].)

## IV. *Analysis*

On one level, the insurance coverage issues raised on appeal are more complex than the usual coverage dispute because this court must engage in a double-layered analysis. Because Allstate incorporated the homeowners association rules into its policy, it is necessary to not only determine the meaning of the words contained in the four corners of the insurance policy, but also to determine the meaning of the language used in the CC&R's, drafted by third parties. On another level, our resolution of these issues is simplified because we are reviewing this case at the pleading stage (instead of the more typical summary judgment context) where we are required to determine whether the policy holder's interpretation is a reasonable one or whether the policy terms are ambiguous permitting extrinsic evidence to explain the policy language. Unless the relevant language in these two documents is clear and unambiguously establishes that Palacin's claim is not covered, the demurrer should have been overruled.

### A. *Does Palacin Have Any Insurance Responsibility Under the CC&R's?*

Allstate argues that it met its burden of showing no coverage as a matter of law because coverage under its policy is triggered only for real property damage that Palacin is "responsible" for insuring and the Casablanca CC&R's does not impose *any* responsibility on Palacin to purchase real property insurance and instead places exclusive responsibility on the Homeowners Association to obtain *all* property insurance for the development.

Under section 8.2, the Homeowners Association is responsible for obtaining fire and extended coverage for "all improvements within the Development," and each owner must be named as an insured under these policies.

(See *ante*, fn. 2.) We agree with Allstate that this broad language appears to initially place responsibility on the Homeowners Association to obtain comprehensive property insurance for the condominium development, including the external and internal structure of the condominium units. But we must read this section in conjunction with section 8.3, which expressly permits the homeowner to obtain property insurance under specified circumstances. (See *ante,* fn. 3.) Palacin argues, and we agree, that at least one reasonable interpretation of these provisions is that section 8.3 identifies the items that a condominium owner is implicitly responsible for insuring, if he or she elects to do so.

First, this construction is supported by the language of the Allstate policy stating that the policy covers items that are the owner's "expressed *or implied responsibility*" under the governing rules. (Italics added.) This phrase means that the homeowner rules need not state directly that the owner is responsible for obtaining a particular coverage, but that Allstate's policy coverage may be triggered if the condominium owner's responsibility to obtain the insurance is merely suggested under the CC&R's and reasonably understood by the involved parties. This implied responsibility can be reasonably gleaned from the Casablanca CC&R's. By making exceptions to the rules imposing insurance responsibility on the Homeowner's Association, section 8.3 can be reasonably construed to imply that these exceptions effectively establish the items for which the homeowner (rather than the Homeowners Association) will be responsible for insuring. This interpretation furthers the agreed purpose of the Casablanca CC&R's by avoiding double coverage and is consistent with the objective of the limiting provision in the Allstate policy's insurance clause, which is to mirror the allocations of insurance responsibility set forth in the CC&R's.

Moreover, unlike Allstate's proposed construction, this interpretation gives effect to the real property coverage in Allstate's policy. If, as Allstate argues, the Casablanca CC&R's are read to mean that a condominium owner has *no* responsibility to obtain any real property insurance for any property item or for any peril, the "Building Property" protections in the policy become meaningless. Taken to its logical conclusion, Allstate's position means that it was not in fact selling Palacin any real property insurance because Palacin had no responsibility to obtain any of the coverage. An insurance policy should not be interpreted to make policy terms meaningless. (*Kavruck v. Blue Cross of California, supra,* 108 Cal.App.4th at p. 783; *Union Oil Co. v. International Ins. Co.* (1995) 37 Cal.App.4th 930, 935 [44 Cal.Rptr.2d 4]; *Titan Corp. v. Aetna Casualty & Surety Co.* (1994) 22 Cal.App.4th 457, 474 [27 Cal.Rptr.2d 476].) Particularly at the pleading stage, we decline to conclude that the only reasonable interpretation of the

Allstate policy is one that essentially provides the real property provisions of the Condominium Owners insurance policy have no potential value to a condominium owner.

### B. *Does Palacin Allege Property Damage Within Palacin's Insurance Responsibility?*

The question next becomes whether Palacin alleged, or can amend her complaint to allege, that the items for which she seeks coverage were her implied insurance responsibility under section 8.3 of the Casablanca CC&R's.

### 1. *Improvements*

Palacin first argues that her property damaged by the water fell within the definition of "improvements" under section 8.3. This portion of section 8.3 states that a condominium owner may separately insure the "improvements made by an Owner within his Unit . . . , but the insurance is to be limited to the type and nature of coverage commonly known as tenant's improvements." (See *ante,* fn. 3.)

Palacin contends that the interior structure of the condominium constitutes an "improvement[]" within the meaning of section 8.3. This interpretation is unsupported by the plain language of the insurance policy and the Casablanca CC&R's. Section 8.2 provides that the Homeowners Association is responsible for obtaining fire insurance, extended coverage, and a special form endorsement for "all of the improvements within the Development." (See *ante,* fn. 2.) The word "improvements" as used in this paragraph broadly refers to the common area and individual buildings that comprise the condominium development. However, section 8.3 then makes an exception for "improvements made by an Owner," but limits the word "improvements," as used in this section, to those additions "commonly known as tenant's improvements." (See *ante,* fn. 3.) This more limited definition of the word "improvements" is further qualified by the statement in section 8.3 that those "improvements" must have been *added* "by an Owner." This interpretation is consistent with the Allstate policy's Building Property Protection provision that specifically provides the real property coverage includes "fixtures . . . installations or additions . . . *only when* situated within that portion of the premises used exclusively by you *and made or acquired at your expense.*" (Boldface omitted, italics added.)

Under these provisions, Palacin did not allege damage to "improvements made by an Owner" that were "made or acquired at [Palacin's] expense." Palacin's complaint alleges only that a water discharge resulted in damage to

"that portion of the premises used exclusively by [Palacin] (*the inner surfaces of the walls, ceilings, and floors*) . . . ." (Italics added.) Even when viewing these allegations in the light most favorable to Palacin, the "inner surfaces of the walls, ceilings, and floors" do not constitute an "improvement[]" to the condominium unit that was "made by an Owner." Rather, these alleged damages reflect damages to the interior structure of Palacin's condominium unit, which does not constitute an improvement within the meaning of section 8.3 of the Casablanca CC&R's.

We reject Palacin's argument that the fact that the Casablanca CC&R's impose responsibility on each individual owner to repair and maintain the interior surfaces of the condominium unit means that an owner is the party responsible for insuring these interior structures. There is nothing in the Casablanca CC&R's that equates maintenance responsibility with insurance coverage responsibility.

We conclude, however, that Palacin met her burden to show a reasonable probability she could amend her complaint to show damages to "improvements" under section 8.3. In her appellate brief, Palacin clarified that the water damage required her to repaint walls and replace carpet pads. Paint and/or a carpet pad could conceivably constitute the type of improvement commonly known as a "tenant's improvement[]" within the meaning of section 8.3. Moreover, based on Palacin's counsel's comments at oral argument, it appears reasonably probable that Palacin could allege that these real property items were added to the unit by a condominium owner and were "made or acquired at [Palacin's] expense" within the meaning of the applicable insuring clause.

### 2. *"Covered by" the Casablanca Homeowners Association's Insurance*

Palacin additionally contends the court erred in sustaining the demurrer because the alleged damages were not "covered" under the Homeowners Association's insurance policy and therefore they were her insurance responsibility and thus covered by the Allstate policy. However, the factual predicate underlying this theory does not appear in Palacin's complaint. Because Palacin never alleged the lack of Homeowners Association insurance coverage or even mentioned the Homeowners Association's policy in her complaint, these facts were not before the trial court and thus the court could not have overruled the demurrer on this basis. But we agree with Palacin that the court should have provided her the opportunity to amend her complaint to include these allegations. As explained below, with these amendments, the complaint would state an actionable claim at the pleading stage.

The first sentence of section 8.3 states "Except as provided in this Section, no Owner can separately insure his Unit or any part of it against loss by fire or other casualty *covered by any insurance carrier* under Section 8.2 . . . ." (See *ante,* fn. 3, italics added.) The logical corollary to this rule is that an owner is permitted to separately insure his or her unit or any part of it to the extent the property is not "covered by any insurance carrier under Section 8.2." At least one reasonable interpretation of this permissive authority is that this authorization to obtain insurance not covered by the Homeowners Association's insurance policy is equivalent to an implied responsibility to obtain this insurance if the condominium owner so desires.

This interpretation is objectively reasonable when viewed in context of the claim and the purpose of the policy. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265, 1276 [10 Cal.Rptr.2d 538, 833 P.2d 545] [courts must "interpret [policy] language in context, with regard to its intended function in the policy," and employ "common sense"].) Because the central purpose of the insurance allocation rules set forth in sections 8.2 and 8.3 is to avoid double coverage, it is reasonable to read the Casablanca CC&R's as providing that an insured is entitled to purchase any real property coverage that the Homeowners Association had not obtained through its own policy. As Allstate states in its appellate brief, "[b]y . . . tying the scope of coverage to the condominium rules, the Allstate policy automatically tailors itself to provide the correct scope of non-overlapping coverage—thereby relieving the unit owner of the need to determine what property the [Homeowners Association] covers." This is precisely what we are concluding is a reasonable policy interpretation based on the materials before us. If Palacin can amend her complaint to allege that the Homeowners Association's insurance policy does not in fact cover the real property losses, it is reasonable to conclude that Palacin was permitted to obtain such coverage and therefore the coverage was within Palacin's implied insurance responsibility triggering the Allstate policy's coverage.

In reaching this conclusion, we emphasize that the issue at this stage of the proceedings is whether Allstate has met its burden to show that the policy unambiguously did not cover the alleged losses because Palacin did not have an express or implied responsibility to obtain coverage for the damaged items. As we have observed, one reasonable interpretation of section 8.3 is that this section not only defines the insurance that an owner is permitted to obtain but it also defines the condominium owner's implied insurance responsibility under the Casablanca CC&R's. One of those coverages that an insured is permitted to purchase under section 8.3 is real property insurance coverage that has not been obtained by the Homeowners Association. Because there is a reasonable probability that Palacin can amend her complaint to add an allegation that the Homeowners Association's policy does not cover

her losses, and that the losses were her insurance responsibility (thus triggering coverage), she should be given the opportunity to do so.

In arguing that this interpretation is unreasonable, Allstate relies on a condominium law treatise stating that a form provision containing language identical to section 8.3 "is intended to ensure that the blanket insurance policy obtained by the association is the sole coverage on the structure by prohibiting an individual owner from acquiring fire or casualty insurance on it." (See Graham, et al., Cal. Condominium and Planned Development Practice (Cont.Ed.Bar 1984) §§ 6.128, 6.130.) However, this treatise did not address the specific issue raised here concerning a condominium owner's insurance coverage where the claim is allegedly not covered by the homeowners association's policy. Moreover, even assuming there was evidence showing this interpretation was shared and/or adopted by the drafters of the Casablanca CC&R's, a drafter's uncommunicated intent is not controlling in interpreting contract language. (See *Alex Robertson Co. v. Imperial Casualty & Indemnity Co.* (1992) 8 Cal.App.4th 338, 346 [10 Cal.Rptr.2d 165].) We are governed by the language of the policy (including the incorporated CC&R's) and well-settled insurance construction rules, rather than a legal commentator's opinion regarding the meaning of a CC&R form provision. (See *National Auto. & Casualty Ins. Co. v. Stewart* (1990) 223 Cal.App.3d 452, 458–459 [272 Cal.Rptr. 625].) Allstate's focus on the various types of insurance that can be purchased by condominium homeowners associations is likewise unavailing. Although Allstate may have had in mind precisely the nature of the real property coverage it was intending to cover based on its specialized knowledge of the condominium insurance industry, it did not clearly communicate this intention to its insured through its policy language.

Moreover, Palacin's proposed interpretation of section 8.3 does not—as Allstate suggests—"ignore[] [the] carefully crafted system" that seeks to prevent double coverage. To the contrary, by interpreting the Allstate policy to mean that a condominium unit owner may be covered for items for which the Association did not obtain real property coverage, this interpretation, by definition, avoids any possibility of double coverage.

Allstate additionally argues that if it had intended to cover items that were not actually covered by the Homeowners Association's policy, its policy would have stated "[w]e will cover causes of loss that the master carrier does not." This sentence would have been clear and unambiguous. Similarly, if Allstate's policy had stated that it covered only tenant-type improvements made by a condominium owner or that it covered only items that were expressly made the owner's responsibility under the Casablanca CC&R's, these statements would arguably have been clear and unambiguous. But the Allstate policy did not contain such clear and unambiguous statements.

Instead, by making insurance coverage dependent on what is "implied" by another document written by third parties and leaving it to the insured to figure out exactly what that meant, Allstate left substantial uncertainty as to the scope of coverage and therefore cannot prevail at the pleading stage.

■ We conclude Palacin should be given the opportunity to amend her complaint to allege her property damage was not "covered by any insurance carrier under Section 8.2." If she can amend her complaint in this manner, the litigation can proceed beyond the pleading stage on this issue to permit the parties to present any extrinsic evidence relevant to resolving the ambiguities in the policy and then to apply settled insurance construction rules to determine the meaning of the insurance clause and any applicable exclusions.

In light of our disposition, we do not reach the parties' arguments regarding the validity of the fraud and bad faith claims. In the event Palacin amends her complaint, the validity of her claims for fraud and bad faith can be properly resolved at a later time.

## DISPOSITION

Judgment is reversed with directions to vacate the order sustaining Allstate's demurrer without leave to amend and to enter a new order sustaining Allstate's demurrer, but giving Palacin leave to amend her complaint to allege that her claimed property damage was not covered by her homeowners association's insurance policy and/or to allege that the items damaged constitute "improvements" within the meaning of the insurance policy (and incorporated CC&R's). Palacin is entitled to recover costs on appeal.

Huffman, Acting P. J., and Aaron, J., concurred.

A petition for a rehearing was denied July 8, 2004.