Filed 8/27/14  Watson Cogeneration v. So. Cal. Edison CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WATSON COGENERATION COMPANY, | B251746 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC473092) |
| v. | |
| SOUTHERN CALIFORNIA EDISON COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Gregory W. Alarcon, Judge.  Affirmed.

Rovens Lamb and Steven A. Lamb for Plaintiff and Appellant

Carlsmith Ball, James Polish; Southern California Edison Company, Leon Bass, Jr., and Michael J. Barrett for Defendant and Respondent.

_____

This is an action for breach of contract and unjust enrichment by an energy producer, Watson Cogeneration Company (Watson), against an energy buyer, Southern California Edison Company (SCE). The parties do not dispute that SCE agreed to purchase energy from Watson at a specified price for a 20-year period. They disagree whether that 20-year period terminated on December 31, 2007, as SCE contends, or on April 5, 2008, as Watson contends. The trial court agreed with SCE's interpretation of the agreement and entered judgment in its favor on both causes of action. We affirm.

**FACTS AND PROCEEDINGS BELOW**

The following facts are undisputed.

Watson owns a cogeneration facility that produces energy for refining petroleum and running electricity-generating turbines.

In 1984, Watson entered into a contract to sell the excess energy it produced to SCE at the agreed-on price for a period of 20 years. (The parties refer to this agreement as the Power Purchase Contract or PPC.) The PPC provided in section 1.8 that it "shall continue in effect for a period of 20 years beginning on the Firm Operation Date." The "Firm Operation Date" was defined in section 2.15 of the contract as: "The date agreed on by the Parties on which each generating unit(s) of the Generating Facility is determined to be a reliable source of generation and on which such unit can be reasonably expected to operate continuously at its effective rating (expressed in kW)." The PPC further provided in section 1.7 that the "Firm Operation Date for the Generating Facility will be on or before December 31, 1988."

In 1986, SCE sent Watson some proposed modifications of the PPC including a modification of the definition of "Firm Operation Date" in section 2.15. (We show the *proposed* language in italics and the existing language in bracketed strikeout-type.) "Firm Operation Date: The date agreed on by the Parties on which [each generating unit(s)] *all the generating units* of the Generating Facility [is] *are* determined to be [a] reliable [source] *sources* of generation and on which such [unit] *units* can be reasonably

2

expected to operate continuously at [its] *their* effective [rating] *ratings* (expressed in kW)." (Italics and strikeouts added.)

In 1988 the parties amended the PPC sections pertaining to its commencement date. They did not adopt the changes SCE proposed in 1986, discussed above. Instead, they amended section 2.15 to state in relevant part: "The Firm Operation Date for the Generating Facility shall be the Firm Operation Date for the last individual Generator to achieve firm operation. The Firm Operation Date for individual Generators shall be the date agreed on by the Parties on which each Generator of the Generating Facility is determined to be a reliable source of generation and on which such Generator can be reasonably expected to operate continuously at its effective rating (expressed in kW)." The parties also amended section 1.8 to read: "This contract . . . shall continue in effect for a period of twenty years (20) beginning on the *earliest* Firm Operation Date." (Italics added.) We will refer to these changes in the PPC as the 1988 Amendments.

Watson's facility consists of six power generating units. The parties agree that the *first* generator achieved firm operation on January 1, 1988 and that the *last* generator achieved firm operation on April 6, 1988.

The parties dispute whether the 20-year term of the contract began on the date the first generator attained firm operation or on the date that all the generators had obtained that status. SCE contends that the PPC expired on December 31, 2007, 20 years after the first generator achieved firm operation, i.e. the "earliest" Firm Operation Date.

Watson sued SCE for breach of contract, unjust enrichment and declaratory relief claiming that the PPC did not expire until April 5, 2008, 20 years after the last generator attained firm operation, and therefore SCE owed it over $10 million under the contract.[1]

After considering extrinsic evidence as to the PPC's commencement date, the trial court sustained SCE's demurrer to the breach of contract cause of action without leave to amend, overruled SCE's demurrer to the unjust enrichment cause of action and

---

[1]    After December 31, 2007, SCE continued to purchase energy from Watson but at a lower rate.

subsequently granted SCE's motion for summary judgment on the claim of unjust enrichment.[2] Watson filed a timely appeal.

## DISCUSSION

### I. THE 1988 AMENDMENTS UNAMBIGUOUSLY PROVIDE THAT THE CONTRACT'S 20 YEAR PERIOD COMMENCES ON THE DATE THE FIRST GENERATOR ATTAINS FIRM OPERATION.

We review de novo the trial court's ruling sustaining the demurrer. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

Watson contends that the trial court erred in sustaining the demurrer to its breach of contract cause of action because the PPC is ambiguous as to the commencement date and the extrinsic evidence alleged in the complaint and submitted with Watson's request for judicial notice shows that the PPC could reasonably be interpreted to mean that the commencement date was April 6, 1988, the date by which all of Watson's generators had attained firm operation. We hold as a matter of law that the contract is not reasonably susceptible to Watson's interpretation.

The party "moving for a demurrer based on [contract] language must establish conclusively that this language unambiguously negates beyond reasonable controversy the construction alleged in the body of the complaint. [Citation.] To meet this burden, [the defendant] is required to demonstrate that the [contract] language supporting its position is so clear that parol evidence would be inadmissible to refute it. [Citation.] Absent this showing, the court must overrule the demurrer and permit the parties to litigate the issue in a context that permits the development and presentation of a factual record, e.g., summary judgment or trial." (*Palacin v. Allstate Ins. Co.* (2004) 119 Cal.App.4th 855, 862.) When ruling on a demurrer the court must conditionally consider any parol evidence alleged in the complaint or subject to judicial notice to determine if it would be relevant to prove a meaning to which the contract is reasonably

---

[2] The court also sustained SCE's demurrer to the declaratory relief cause of action. Watson does not challenge that ruling.

susceptible.  (*George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1122 [evidence alleged in complaint]; *Ascherman v. General Reinsurance Corp.* (1986) 183 Cal.App.3d 307, 310-311 [evidence judicially noticed].)

In ruling on the demurrer in this case, the court took judicial notice of the 1988 Amendments and documents filed by SCE with the Public Utilities Commission, along with the parol evidence that Watson alleged in its complaint.

The 1988 amendments established a Firm Operation Date for the generating facility itself and separate Firm Operation Dates for the individual generators.  The amended PPC defined the Firm Operation Date for the *facility* as the date "the last individual Generator . . . achieve[s] firm operation."  Each *individual generator*, however, had its own firm operation date defined as "the date agreed on by the Parties on which each Generator of the Generating Facility is determined to be a reliable source of generation . . . ."

Amending section 2.15 of the PPC to create seven Firm Operating Dates—one for the facility and six for the individual generators—instead of retaining a single Firm Operating Date would indeed have created an ambiguity because section 1.8 of the contract stated that the 20-year term "shall continue in effect for a period of 20 years beginning on *the* Firm Operation Date."  (Italics added.)  That made sense when there was only one Firm Operating Date but not when there were seven.  To avoid that ambiguity, the parties amended section 1.8 of the PPC to state that it "shall continue in effect for a period of twenty years (20) beginning on the *earliest* Firm Operation Date." (Italics added.)  The earliest Firm Operation Date occurred on January 1, 1988 when Gas Turbine Generator Unit Number 4 attained firm operation.  Accordingly, the PPC was effective from January 1, 1988 to December 31, 2007 and SCE did not breach the contract.

Watson spends considerable energy arguing that the term "earliest" Firm Operation Date is ambiguous and does not necessarily mean the first Firm Operation Date.  In the context of the PPC, it does.  As the trial court explained, for the term

5

"*earliest* Firm Operation Date" to have meaning, there has to be more than one such date. (Italics added.)  It is undisputed that the first Firm Operation Date occurred on January 1, 1988, when Gas Turbine Generator Unit Number 4 attained firm operation.  Therefore, January 1, 1988 was the "earliest" Firm Operation Date.  It is also undisputed that the *last* generator achieved firm operation on April 6, 1988.  The "earliest" date simply cannot mean the "last" date anymore than in Boston "the Bunker Hill Monument" can mean "the Old South Church."  (*Goode v. Riley* (1891) 28 N.E. 228.)

## II. WATSON CANNOT ESTABLISH ITS CLAIM THAT THE CONTRACT WAS MODIFIED TO TERMINATE IN APRIL 2008

### A. Background

We review the trial court's summary judgment ruling de novo to determine whether the moving party met its burden of showing that there is no triable issue of any material fact and that it is entitled to judgment as a matter of law.  (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 274.)

The trial court initially sustained SCE's demurrer to Watson's cause of action for unjust enrichment with leave to amend.  Watson filed an amended complaint which, liberally construed, purports to allege a cause of action for unjust enrichment based on two theories:  (1) that between January 1 and April 6, 2008, SCE continued to bill its customers according to the PPC rate while it unjustly paid Watson a lower rate and pocketed the difference; and (2) that SCE unjustly denied Watson payment at the PPC rate because SCE's statements over the years had modified the contract to extend beyond December 2007.

The court overruled SCE's demurrer to the amended complaint for unjust enrichment.  As to Watson's second theory of recovery, the court ruled that "Watson is also basing its unjust enrichment claim on the fraudulent or unfair representations by SCE that the contract did not expire until April 6, 2008."  In other words, the court stated, "it can be reasonably construed that Watson is alleging that 'it would be

6

inequitable to deny Watson the benefit of SCE's apparent modification of the'. . .
contract so that the Contract [T]erm ended on April 6, 2008."

Subsequently, the court granted SCE's motion for summary judgment on
Watson's unjust enrichment cause of action.

The court found that SCE was entitled to summary judgment on Watson's first
theory of unjust enrichment—that SCE "short changed" Watson and Watson does not
challenge this ruling.

### B. Watson's Evidence Does Not Support Its "Equitable Modification" Theory.

The court did not address Watson's second—"equitable modification"—theory of
unjust enrichment. Watson contends the court erred in not doing so because the theory
was briefed by the parties and the court had earlier concluded that Watson was basing its
unjust enrichment claim, in part, on the theory "that 'it would be inequitable to deny
Watson the benefit of SCE's apparent modification of the' contract." The parties have
briefed the issue on appeal and therefore we proceed to address it. (See Code Civ. Proc.,
§ 437c, subd. (m)(2).)

Watson argues that even if the 1988 Amendments meant that the term of the PPC
began when the first generator achieved firm operation on January 1, 1988 and ended
20 years later, on December 31, 2007, SCE subsequently extended the termination date to
April 5, 2008.

Watson supports its argument with evidence of documents SCE submitted to the
Public Utility Commission in May 1998. In one of these documents SCE described
the term of its contract with Watson as "20 years from the Firm Operation Date, April 6,
1988." In the other document, an SCE official stated that "[t]he Watson contract term
extends until April 6, 2008."

SCE counters with undisputed evidence that in 2001, in a different lawsuit
between the parties, Watson's executive director testified that the 1998 Amendments
"set a 20-year Contract Term commencing on the date of the earliest Firm Operation
Date. That date was January 1, 1988." Another Watson executive testified in the same

7

action that the "starting date under the contract was January 1, 1988, and the Contract [T]erm was set for 20 years."

The conclusion we draw from this evidence is that at various times executives of both parties were confused about the commencement date of the PPC but there was no modification of the contract under any recognized legal or equitable theory.

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

WILEY, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.